# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ZOHAR III, CORP., *et al.*, | : | Chapter 11 |
| | : | |
| Debtors. | : | Case No. 18-10512-KBO |

_____

| | | |
|---|---|---|
| ZOHAR III CORP., *et al.*, | : | |
| | : | |
| Appellants, | : | Civ. No. 21-628-TLA |
| v. | : | |
| | : | |
| LYNN TILTON, *et al.*, | : | |
| | : | |
| Appellees. | : | |

_____

## **MEMORANDUM OPINION**

October 19, 2022
Wilmington, Delaware

AMBRO, *Circuit Judge*, sitting by designation.

Zohar III, Corp., and its affiliated debtors and debtors in possession (collectively, the "Debtors") appeal a Bankruptcy Court order approving the sale of certain assets. For the following reasons, I affirm.

I.

The Debtors are investment entities created by Lynn Tilton. They raised capital by issuing notes to investors and then used that capital to make debt and equity investments in distressed companies (the "Portfolio Companies"). On March 11, 2018, Tilton filed them for bankruptcy protection under Chapter 11.

Their bankruptcy petitions were hotly contested. Eventually, the key parties—the Debtors, Tilton along with her affiliates, and the Debtors' most significant secured lenders—entered into a Settlement Agreement. It required the Debtors (through their Chief Restructuring Officer, or "CRO") and Tilton to monetize jointly the Portfolio Companies. The parties "acknowledged that the CRO w[ould] act in the best interests of the [Debtors], and Tilton in the best interests of the . . . Portfolio Companies." A-233–34 ¶ 10.

Global Automotive Systems, LLC ("Global") was one of the Portfolio Companies to be monetized. It manufactured metal-formed assemblies for the automotive industry. Tilton was its manager and CEO. The Debtors owned 100% of its common membership interests, while Tilton indirectly owned 100% of its Class A membership interests. The Class A interests are entitled to distribution in full prior to the common membership interests.

Global had two secured credit facilities: (1) an asset-based lending facility (the

"ABL Facility") held by a Tilton affiliate; and (2) a term loan (the "Term Loan") held by the Debtors and two Tilton affiliates. The ABL Facility was almost fully drawn at $24 million. The Term Loan was in default as of April 2019, with about $150 million owed to the Debtors and about $12 million owed to the Tilton affiliates. Substantially all of Global's assets secured the credit facilities. Under a 2007 intercreditor agreement, the ABL Facility had first priority over the majority of Global's operating assets, and the Term Loan had first priority over the remaining assets.

With the Debtors' and Tilton's agreement, Global hired investment banker Donnelly Penman & Partners Inc. ("Donnelly Penman") in May 2020 to facilitate a sale of the company. The firm conducted due diligence throughout the summer and fall of 2020. After several extensions, Tilton and the Debtors agreed Global would go to market in December 2020. Donnelly Penman communicated with 298 interested parties (including the Debtors and Tilton), 80 of which agreed to sign non-disclosure agreements to explore a potential sale. At the same time, it was working with Tilton and Global's management to prepare a Confidential Information Memorandum for the bidders. It also drafted a bid process letter with information on how and when to submit bids. On December 19, Donnelly Penman sent the Memorandum and bid process letter to the prospective buyers.

Also in December 2020, Global hired Mark Berger of Portage Point Partners to serve as its Independent Sales Process Manager. The intent was to ensure a fair and transparent sale process given Tilton's interest in bidding on the company. The Debtors assert they were not consulted on his hiring. Concerned Berger was not sufficiently independent, they asked the Bankruptcy Court to replace him. The Court rejected that

request.

By January 15, 2021, Global had 14 initial offers ranging from $26 to $80 million, including one from Tilton affiliate Advanced Vehicle Assemblies, LLC ("AVA"). The Debtors did not submit an offer. Nine of the bidders (counting Tilton's entity) received invitations to the next phase of the marketing process. Global's management presentations followed shortly after to the eight non-Tilton-affiliated bidders.

As those presentations were wrapping up, Donnelly Penman learned of an emerging liquidity crisis stemming from a global semiconductor shortage. Shortly thereafter, Global alerted the Debtors that it was going to sell a dormant plant in Saline, Michigan, for $1.1 million. Global asked to keep all the proceeds from the sale to fund its operations. The Debtors agreed. On March 4, Global gave the Debtors an updated cash flow forecast indicating it would need more than $4 million by March 12 to continue operations. It requested that the Debtors fund the liquidity shortage, but they could not.

Meanwhile, Global shared its liquidity concerns with the bidders, and extended to March 5, 2021 the deadline for them to submit letters of intent. Three parties (including Tilton's AVA) submitted letters. AVA offered to purchase Global's equity for $44 million, conditioned on a portion of the purchase price being credit bid to pay the balance of the ABL Facility.

Between March 5 and March 11, Donnelly Penman and Berger met with the three bidders and analyzed their bids. At the same time, Donnelly Penman was communicating with the Debtors and Tilton to work out a mutually acceptable rescue financing deal. Tilton told Global to defer certain non-critical payments, resulting in a revised need of $2 million

3

to fund five weeks of its operations. She offered to loan the funds on a super-priority basis if the Debtors would agree not to challenge the validity and priority of the Tilton affiliates' ABL Facility and Term Loan liens. The Debtors objected to the Term Loan priority condition, and Tilton offered to remove it if the Debtors would support AVA's $44 million bid.

The Debtors objected again, noting that the working capital adjustment could reduce their projected recovery. In response, Tilton agreed to give up any working capital adjustment, which would have left the Debtors with approximately $6 to $8 million after the sale. But they still found the terms unacceptable. It was the afternoon of March 11, and Global needed the $2 million financing the next day. Without a commitment from the Debtors, Tilton offered to provide the funds through the existing ABL Facility if Berger agreed to sign a revised letter of intent, giving AVA an exclusivity period and reducing its bid to $36 million. Berger signed the letter, and Global received its rescue financing. After further negotiations, Tilton reduced AVA's bid to $32 million—a purchase price that would likely provide the Debtors no consideration for their loans and equity.

Before accepting AVA's offer, Donnelly Penman analyzed the two other pending bids as well as a potential liquidation scenario. It concluded that the proposed purchase price of $32 million remained the "highest and best offer for [Global's] assets." A-1739. The result was that Global and AVA signed an Asset Purchase Agreement on March 23, 2021. Global then filed with the Bankruptcy Court a motion seeking approval of the sale per the Settlement Agreement.

When the Debtors again objected, the Court held a three-day trial, admitted 68

exhibits into evidence, and, after taking the matter under advisement, entered an order approving the sale. It explained that if it could not "compel a non-consensual sale and release of liens and claims," then "the entire premise of the monetization process would be undermined." A-2098. While acknowledging the Debtors' contention that the sale process was imperfect, the Court found "the overwhelming weight of the evidence indicates that the . . . process was fair and designed to be value-maximizing[,] that Ms. Tilton's contributions to the process on behalf of [Global] were beneficial[,] and that the processes established by [the] Court, as well as Mr. Berger, were followed in all material respects." A-2098–99. The Court also considered the "unforeseen events that required [Global] to secure financial support from Ms. Tilton and pursue her bid in short order to preserve ongoing operations." A-2099. It concluded that the Debtors had an opportunity to "ameliorate or avoid these facts and circumstances, but declined," and that there was "no meaningful alternative to the proposed transaction that will likely yield a better result for these estates." A-2099.

II.[1]

---

[1] The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157 and 1334(b). Appellate jurisdiction is under 28 U.S.C. § 158(a)(1), which permits review of the Bankruptcy Court's "final judgments, orders, and decrees." Issues (like this one) that are "likely to affect the distribution of the debtor's assets, or the relationship among creditors," are routinely treated as final. *In re Owens Corning*, 419 F.3d 195, 203 (3d Cir. 2005) (quoting *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 98 (3d Cir. 1988)). I review the Court's "legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof." *In re O'Brien Envt'l Energy, Inc.*, 188 F.3d 116, 122 (3d Cir. 1999).

5

The Debtors submit several issues for review. First, while they acknowledge that the parties' Settlement Agreement gives the Bankruptcy Court authority to compel a nonconsensual sale of estate assets, they argue it can only do so if it first determines that the sale is in the Debtors' best interest. But the Agreement contains no express language to that effect. All the Debtors do is point to the CRO's duty under the Agreement to "act in the best interests of the [Debtors]." A-234. But this provision implies, at most, that the Debtors "cannot obstruct a sale that would be in their best interest." Appellant Br. 37. It doesn't require the Court to find affirmatively that a sale is in the Debtors' best interest before compelling it.

As the Court recognized, the parties agreed that a joint monetization process would best serve the interests of the Debtors' stakeholders and the Portfolio Companies. But their Agreement—which, again, requires Tilton to act in the Portfolio Companies' best interest and the CRO to act in the Debtors' best interest—acknowledges that interests may diverge during that process. The Court evaluated the evidence relevant to the Global sale and determined it was "fair and designed to be value-maximizing." Moreover, there was "no meaningful alternative" likely to yield a better result for the Debtors. A-2099. They fail to show that anything more was required.[2] The Debtors take issue with the Court's factual

---

[2] The Debtors initially argue that requiring them to consummate a transaction that is contrary to their best interests would conflict with Bankruptcy Code § 363, concerning the use, sale, or lease of estate property. *See* Appellant Br. 39–40. Debtors appear, however, to have abandoned this argument on reply. *See* Reply Br. 16 ("Lastly, while Section 363 of the Bankruptcy Code permits sales free and clear of liens, it is not applicable . . . because GAS was not a debtor . . . . At the Debtor's [sic] urging, the Bankruptcy Court removed all references to Section 363 from the GAS Order before entering it.") (internal citations omitted).

findings: they suggest a liquidation would have given them a better outcome than the Tilton bid. But they do not establish that the Court's contrary finding was clearly erroneous, especially given the analysis performed by Donnelly Penman indicating that, even in a liquidation, the Debtors would not have received any more than they would in the sale. *See* A-1735–36.

The Debtors next contend the Court could not, under Delaware law, approve the Global sale unless Tilton showed the transaction was "entirely fair" (which they assert she failed to do). That standard applies to conflicted transactions and requires the buyer to establish "that the transaction was the product of both fair dealing *and* fair price." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013) (emphasis in original) (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995)). The Debtors say it applies here because Global's LLC Agreement incorporates the entire-fairness standard to govern conflicted transactions. Even so, it is not clear it would apply to this sale, which was conditioned on the approval of an independent and disinterested sales process manager. *See Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1213 (Del. 2012) (noting that a conflicted transaction between two LLCs would not be subject to the entire fairness standard if "conditioned . . . upon the approval of an informed majority of the nonaffiliated members").

Regardless, while the Bankruptcy Court did not mention "entire fairness" expressly, it did rule that the sale process was fair and that no better price was available. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed

7

to the directors, and how the approvals of the directors and the stockholders were obtained"); *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 791 (Bankr. S.D.N.Y. 2020) ("Fair price can . . . be established by demonstrating that no better alternatives were available.").

In arguing otherwise, the Debtors largely distort the record. They say they were shut out of the process. The evidence, however, indicates that Donnelly Penman held weekly update calls with the Debtors or their financial advisors, plus "numerous impromptu meetings" and the exchange of "countless emails." A-1722. Berger also had regular calls and meetings with the Debtors' advisors. Indeed, their own investment banker testified that Donnelly Penman was responsive in keeping the Debtors updated on the sale process. The only communication issue identified was Donnelly Penman's failure to circulate the final version of the Confidential Information Memorandum to the Debtors before sending it to all prospective buyers. But the Debtors identify no errors in that document or any prejudice to the process resulting from their delayed access to the final Memorandum.

Berger, the Debtors submit, was not sufficiently independent, informed, or involved. But they don't offer evidence that would undermine his testimony that he worked extensively with Global's professionals to understand the company's business operations, received frequent briefings from Donnelly Penman throughout the process, communicated regularly with the Debtors, and formed his own independent judgments as to the sale transaction.

The Debtors' most fervent process-related argument is that Tilton used her insider status to take control and squeeze out other potential bidders. While Tilton, as Global's manager, was involved in preparing and reviewing documents relevant to the sale, the Court determined that her "contributions to the process on behalf of [Global] were beneficial." A-2099. No evidence refutes this finding. The Debtors say she was "aware of the identity of the other bidders as well as their actual bids," Appellant Br. 44, but this contention overstates. The record shows that, after AVA submitted its March 5, 2021 bid, Tilton received a text from a Global employee mentioning the name of one potential bidder that never submitted a letter of intent. There is nothing to suggest her receiving that name affected her entity's offers or the sale process.

The record also indicates that, when negotiating the rescue financing terms, Donnelly Penman disclosed to Tilton that there were no other actionable bids that could close within 30 days. And, after Berger signed AVA's letter of intent for $36 million, Tilton received a transaction update prepared to impart current information about the sale to one of Global's customers. But none of that information renders the transaction fundamentally unfair, as Donnelly Penman presented evidence showing that AVA's final bid offered the best relative outcome available to Global at the time.

That AVA reduced its proposed purchase price a second time, by $4 million, also does not undermine the fairness of the transaction. Debtors argue that the $4 million reduction was calculated to ensure they received zero recovery on account of their secured debt and equity. Appellant Br. at 31–32. But Debtors fail to recognize that the bid was lowered in exchange for an escrow reduction and AVA's assumption of certain liabilities.

9

Perhaps for this reason Debtors were apparently indifferent about the second price drop. *See* A-1178 ("We were more focused on going back to the LOI that Patriarch submitted on March 5th.").

The Debtors' third challenge is to the Court's conclusion that, because it had authority to approve a nonconsensual sale, it could also order the Debtors to release their liens for no consideration. This time they point to a provision of the Settlement Agreement providing for the release of certain Patriarch (a group of Tilton-affiliated entities) liens on and claims against a Portfolio Company sale. They submit that because the parties did not include similar language with respect to the Debtors' liens, they cannot be forced to release them. But they point to no express language or other evidence suggesting that was the parties' intent and, as the Court noted, the joint monetization process would be frustrated if it could not order a release of the Debtors' liens to consummate a nonconsensual sale.

The final contention is that Tilton should not be allowed to "grab all of the proceeds from the sale of a Portfolio Company for herself." Appellant Br. 50. According to the Debtors, the Tilton offer "pervert[ed] the entire purpose of the monetization process and any sale process related to a chapter 11 debtor." *Id.* at 52. Their frustration is understandable: the hope would be that every Portfolio Company sale yields value for the Debtors' estates. But that doesn't mean the Court erred in ordering this sale, where the process was fair and the accepted offer was the best result available under the

circumstances.[3]

In this context, I thus affirm the Bankruptcy Court's approving the sale of Global. An order follows.

---

[3] Appellees ask that this appeal be dismissed as moot, as the Global sale has already occurred. Because the Bankruptcy Court's judgment stands for other reasons, I do not reach this issue.